[Civ. No. 28240. First Dist., Div. Three. Feb. 10, 1972.]

JOHN SEARLE et al., Plaintiffs and Appellants, v. REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Respondent.

[Civ. No. 29234. First Dist., Div. Three. Feb. 10, 1972.]

CELINDA TABUCCHI et al., Plaintiffs and Appellants, v. REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Respondent.

(Consolidated Appeals.)

450

**COUNSEL**

Brundage, Neyhart, Grodin & Beeson and Joseph R. Grodin for Plaintiffs and Appellants.

Thomas J. Cunningham, John E. Landon and John P. Sparrow for Defendant and Respondent.

## OPINION

**DRAPER, P. J.**—These consolidated actions question the authority of the Regents of the University of California to determine that nonmembers of the faculty may not conduct courses given for credit. The regents had, by standing order, delegated to the academic senate power to "authorize and supervise all courses and curricula," but had specifically retained the authority to make appointments to the faculty. On September 9, 1968, a board acting under authority of the academic senate approved a course for the fall quarter entitled "Dehumanization and Regeneration in the American Social Order," designated as Social Analysis 139X. Of 20 lectures during the quarter, 10 were to be given by one Eldridge Cleaver, not a faculty member. On September 20, well before opening of the fall quarter, the regents adopted resolutions: (1) "Effective immediately . . . no one may lecture . . . for more than one occasion during a given academic quarter on a campus in courses for University credit, unless he holds an appointment with the appropriate instructional title . . . ." (2) "If Social Analysis 139X cannot be restructured to satisfy the policy . . . prior to the commencement of instruction in the Fall Quarter . . . [it] shall not be offered for credit. . . ."

It is undisputed that the course was not altered. Rather, it was given as announced, with Mr. Cleaver delivering a number of the lectures. On November 17, the regents, by resolution, found as a fact that the course had not been brought into conformity with the announced policy and resolved that it "not be given academic credit either directly or indirectly." Sixteen students who took the course as given, and six faculty members, sought mandate to compel the regents to grant credit for the course and to rescind its resolutions of September 20. ■ The regents' demurrer to the complaint (save as to two student causes of action later discussed) was sustained. Plaintiffs appeal. We find no error.

Appellants argue that the standing order empowering the academic senate to "authorize and supervise all courses and curricula" is such a delegation of authority as to deprive the regents of power to act. But the regents had specifically retained the power to appoint to the faculty. To designate a lecturer for a university course is to name the person to conduct the course, at least to the extent of the lectures to be given by him. When the designation is of one to conduct a full half of the course, it appears to be a matter of appointment to the faculty, which is clearly reserved to the regents.

In any event, the power granted to the senate is neither exclusive nor irrevocable. The by-laws specifically provide that neither they nor the standing orders "shall be construed, operate as, or have the effect of an abridg-

ment or limitation of any rights, powers, or privileges of The Regents." This limitation not only is authorized, but seems required, by the overriding constitutional mandate which vests the regents with "full powers of organization and government" of the university, and grants to them as a corporation "all the powers necessary or convenient for the effective administration of its trust." (Cal. Const., art IX, § 9.) To accept appellants' argument would be to hold that a delegation of authority, even though specifically limited, amounts to a surrender of authority.

The standing orders also establish procedures for repeal or amendment thereof. These procedural rules were not followed before adoption of the resolutions of September 20. Appellants argue that the procedural limitation established a right in them, which they seek to enforce here. But the decisions relied upon by appellants (*Yellin* v. *United States,* 374 U.S. 109 [10 L.Ed.2d 778, 83 S.Ct. 1828]; *United States* v. *Heffner,* 420 F.2d 809) are readily distinguishable (see *United States* v. *Leahey,* 434 F.2d 7). The procedural requirements fixed by the regents obviously were for their own guidance and benefit. As to anyone other than a member of the regents, reliance upon the procedural provision is precluded.

We recognize that terms of employment of a faculty member may be implied as well as express (see *Greene* v. *Howard University,* 412 F.2d 1128) and that students have certain contractual rights (*University of Miami* v. *Militana* (Fla.App.) 184 So.2d 701; *Carr* v. *St. John's University,* 17 App. Div.2d 632 [231 N.Y.S.2d 410]; *Anthony* v. *Syracuse University,* 224 App.Div. 487 [231 N.Y.S. 435]). But it is not pleaded or suggested that any faculty appellant regarded or relied upon the standing order as to amendment procedures as a term or condition of his employment. Moreover, they knew, well before the opening of the quarter, that the course as announced had been disapproved by the regents. As to the student appellants, this issue was tried. Upon substantial evidence, the court found that they were aware of the regents' denial of credit before beginning the course. In any event, the regents' specific reservation of authority would also have been a condition of any contract with either faculty or students, thus negating the effect now urged.

Both sets of appellants also raise issues as to a course given in the winter quarter. That course, designated Psychology 198, covered the same subject matter as Social Analysis 139X, but provided for few lectures (the trial court found, after trial, that no classroom was assigned to or announced for the course). On November 17, the regents formally resolved that credit should not be given directly or indirectly for Social Analysis 139X. The faculty member conducting course 198 warned all students that credit for

the course might be refused. The court also found that all student plaintiffs enrolled in course 198 had been enrolled in 139X, and that substantially all the work submitted for credit in the former course had in fact been done by them in the fall quarter as students in 139X. The professor in charge, although asked to do so, failed to certify that the work done by the student plaintiffs in course 198 was independent of that they had done in the preceding quarter in course 139X. The court concluded that, as to the student plaintiffs, course 198 was a "transparent device" for giving credit for work done in 139X. The findings are supported, and dispose of appellants' arguments as to 198.

The constitutional right of freedom of expression includes, of course, the right to hear as well as the right to speak. But it does not include the right to receive or to bestow university credit for the listening to or for the choosing of the speaker. The foregoing discussion, without elaboration which would be excessive, adequately disposes of the several forms in which appellants' assertions are presented by the briefs. The dispute here is essentially whether the regents or the faculty shall control university policy in determining whether credit is to be given for courses conducted by nonmembers of the faculty. In light of the constitutional grant of power to the regents, we have no hesitancy in holding that this power is vested in them.

A superficially more difficult problem is presented by the faculty appellants concerning a "censure." In one of the resolutions of September 20, the regents recited the long-standing delegation to the academic senate of authority to approve and supervise courses and curricula, the approval of Social Analysis 139X by the board of educational development of that senate, and the determination of the regents that this course was improperly structured and continued:

"Whereas, The Regents consider that in this instance the trust that must follow such a delegation to the Senate has been abused;

"Therefore, The Regents censure those within the Berkeley Division of the Academic Senate and the Board of Educational Development who were responsible for this action." Four faculty appellants assert that they were denied due process  because they had no notice of the regents' intent to censure, and no opportunity to defend against such a disciplinary step.

Appellants' petition for mandate alleges that the board of educational development proposed, and the senate committee on courses of instruction approved, Social Analysis 139X before the regents' resolutions of September 20 were adopted. The function of the board was to authorize, initiate

and administer experimental instructional programs. In this instance it sought and obtained approval of that action by the senate committee on courses of instruction. Thus those "who were responsible" for establishment of the course were either members of the board or of the committee.

The censure resolution named no one and appellants neither allege nor suggest that any entry or note of censure was shown upon any record of any faculty member.

Thus the four faculty plaintiffs who assert that they were caused "embarrassment" by the censure resolution and that it "affected adversely their academic careers" must allege that the resolution, in some way other than by formal designation by the regents or other authority, could be understood as applying to them. Of course, allegations in the nature of innuendo in an action for defamation could well suffice. We fail, however, to find such allegations.

The resolution itself censures only "those who were responsible for this action." This censure follows recitals of the approval of a course which the regents found to be "improperly structured." The four plaintiffs allege only that they "suffered through denial of credit in a course for which they were responsible." It is undisputed that they were delegated to supervise the course. But the censure is of those responsible for the action of approving the course—not of those who, following such approval, were assigned to conduct it. These appellants do not allege that they either did or were generally thought to have urged, lobbied for, or been otherwise active in securing approval by the board and committee. Thus they fail to bring themselves within the class censured. The resolution was adopted before the course was given, and thus could not relate to its actual conduct. After the course was given as announced and disapproved by the regents, a censure of those "responsible" for flouting the directive doubtless would have reflected, probably justifiably, upon those who in fact supervised or conducted it. But that effect cannot be attributed to them before the course opened.

■ "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. . . . [C]onsideration of what procedures due process may require . . . must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." (*Cafeteria Workers* v. *McElroy,* 367 U.S. 886, 895 [6 L.Ed.2d 1230, 1236, 81 S.Ct. 1743].) Here the governmental interest in control of the state university is substantial and, as demonstrated above, the infringement upon the private interest of plaintiffs is minor, if

not nonexistent. It follows that "notice and hearing are not constitutionally required" (*id.*). The authorities relied upon by plaintiff require notice and hearing before discharge or demotion and could well extend to a recognizable censure which diminishes possibility of promotion or of employment elsewhere. But, as shown, no such result is alleged or indicated here.

Judgment affirmed.

Brown (H. C.), J., and Caldecott, J., concurred.